UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTATE OF KENT KRAMER,
By Douglas Kramer, Personal Representative

        Plaintiff,                      Case No.

vs

SCOTT MINTZ, and the
CITY OF SANDUSKY,
a Michigan municipal corporation,

        Defendants.
_____/
HUGH M. DAVIS, Jr. (P12555)
CYNTHIA M. HEENAN (P53664)
Attorneys for Plaintiff
Constitutional Litigation Associates, P.C.
The Mercier Building
450 W. Fort Street, Suite 200
Detroit, MI  48226
(313) 961-2255; fax (313) 961-5999
conlitpc@sbcglobal.net

ROBERT D. HORVATH (P27633)
Co-counsel for Plaintiff
2833 Crooks Road, Suite 104
Troy, MI  48084
(248) 614-4770; fax (248) 822-3174
Rdhjdlo@aol.com
_____/

**COMPLAINT & JURY DEMAND**

    Plaintiff states:

**Jurisdiction and Parties**

    1.    This is a proceeding arising under the Fourth Amendment, made actionable by 42 USC § 1983,  Jurisdiction is founded on 28 USC § 1331 and 28 USC § 1343 to redress the violation of rights and liberties guaranteed to Plaintiff's decedent, Kent Kramer, by the

1

Fourteenth and Fourth Amendments to the Constitution of the United States, which Kent Kramer sustained when he was wrongfully killed by part-time police officer Scott Mintz of the Sandusky police department on February 27, 2010.

2. Plaintiff also presents a claim under the Michigan Wrongful Death Statute in order to pursue any other potential recoveries for any interested person, as pertinent; this state law claim is supplemental to the remedies of federal law.

3. Venue is proper in the Eastern District of Michigan inasmuch as all parties reside therein and the acts complained of occurred therein pursuant to 28 USC § 1391.

4. Plaintiff ESTATE OF KENT KRAMER is the authorized agent for the interests of decedent Kent Kramer including, specifically but not only, the right to pursue legal remedies for the unlawful taking of his life and all the attendant economic and non-economic benefits of his life (for example, personal earning capacity and the loving and beneficial relationships with family and friends) that he otherwise would have enjoyed but for his unlawful and untimely death. Douglas Kramer is the estate's personal representative.

5. For all pertinent circumstances, the Defendant SCOTT MINTZ was a member of the City of Sandusky Police Department as a part-time officer and he acted under color of law.

6. The Defendant CITY OF SANDUSKY is a Michigan municipality, which employed, trained and supervised Defendant Scott Mintz for all pertinent circumstances; it acted under color of law as a matter of course.

### General Allegations

7. Plaintiff incorporates by reference paragraphs 1 through 6 as though fully stated herein.

8. Kent Kramer was born and raised in Kingston, a small farming community in the "thumb" area of Michigan's Lower Peninsula. He would have turned 30 years old on March 29, 2010. At the time of his death, he lived in Sandusky (at 189 N. Fulton) a few miles from his place of birth and worked as a personal banker at the local Chase Bank office, 410 W. Sanilac (M 46), a few blocks from his home, having transferred from the Burton branch of the bank to the Sandusky branch just a few months before.

9. He had graduated from Kingston High School in 1998 where he was an active and productive student, playing on both the football and basketball teams; and, because of his scholastic achievements, he received an academic scholarship to attend Adrian College, where he completed his undergraduate studies in December 2002, attaining a Bachelor of Science degree in psychology, with a minor in sociology. After graduation from college, his jobs included Wolverine Human Services, a juvenile counseling facility, where he had management responsibilities for program services; there he helped coordinate judicial and probation resources for troubled youth. He was very keen on helping people, particularly young persons. He was active in sports and other pursuits, including hunting. Before joining Chase Bank he worked as a salesman at Joseph Ford, near Flint, where his people skills were put to good use in his daily relationships with customers and fellow employees.

10. He and his family enjoyed a warm and close relationship. His parents, Paula and Douglas Kramer, are both educators who worked for decades in the local public schools as teachers. His father has also served the community as supervisor for Koylton Township and at Kingston United Methodist Church, where both parents are members (Kent was as well); his father has also operated a farm, selling livestock and feed to neighbors and others. His sister, Dr. Melanie Kramer-Harrington, is a licensed physician who lives and practices family medicine in

Sandusky. Dr. Kramer-Harrington and her husband, William Harrington, have two young sons, Ethan and Peyton. Kent particularly enjoyed his relationship with his two young nephews. His affection and regard for other people, and other livings things (illustrated by the care he gave his many pets over the years) was fostered by his family, their mutual endeavors and interests, all underscored by abiding devotion to family, church and community.

11. On Saturday, February 27, 2010, Defendant Scott Mintz worked as a police officer for the Defendant City of Sandusky, having been hired for part-time employment only the year before. Mintz was both young and inexperienced.

12. Sandusky is a city of slightly more than 2,000 people and typifies small town living, where people are friendly and know one another. However, during his limited tenure with the Sandusky police department, Defendant Mintz had encounters with numerous citizens in the community who felt mistreated by him. These included Betty & Bill Alderman, Pat Denton, Bill Maier, Theresa Donaghy, Ryan Miller (and/or girlfriend Stephanie) and Erica & Mike Sheridan. One or more believed he acted like a "young cowboy" or "quick draw McGraw" and his behavior exhibited obvious shortcomings.

13. Defendant Mintz was not trained or supervised properly for the duties and obligations of a police officer, deficiencies that caused his misuse of police authority and his misuse of deadly force in the killing of Kent Kramer. Some noted he had specific problems with stress management as a police officer and that he needed to learn to take a step back in his dealings with people. Mintz had only been licensed for police work since July 2007, when the State of Michigan said he met <u>minimal</u> requirements, and he had never held a full time position with any department. He had been rejected for employment by the Sanilac County Sheriff's Department.

4

14. Shortly after 1 a.m. on that Saturday morning, Defendant Mintz was on patrol in the city of Sandusky when he stopped to assist Kent Kramer, whose car had slid off the snow-covered roadway onto the curb of the northwestern corner of the intersection of West Sanilac (M-46) and Dawson, which happens to be the location of the Sandusky branch of Chase Bank where Kent Kramer worked and, as noted, was just a few blocks from his home.

15. Although Defendant Mintz worked patrol alone, other law enforcement officers were in the vicinity and were available to assist him, including Sanilac County Sheriff's unit 321, a patrol car with two deputies, Todd Laming and Bryan Heilig, and unit 306, a patrol car operated by Sgt. Siemen of that department. The headquarters of the Sanilac Sheriff (65 N. Elk Street) are, in fact, about a mile from W. Sanilac and Dawson, as is the Sandusky post of the Michigan State Police (90 W. Sanilac) and the Sandusky police department, itself (26 W. Speaker).

16. A number of good Samaritans were there already, lending their hands in the effort in pushing Kramer's car back onto the roadway. These included Sandra Stilson, Frank Behm and Marty McSkulin. They and Defendant Mintz were successful in getting the vehicle back onto the roadway, and got it positioned northward on Dawson in the southbound lane. (Mintz had left his patrol vehicle in the northbound lane of Dawson, with flashers on. The positions of the two vehicles effectively blocked Dawson at its intersection with M-46.) The civilians noted no problems with Kramer and were told by Mintz to leave, which they did. After the civilians left, Defendant Mintz investigated the circumstances of Kramer's mishap with his vehicle.

17. During his investigatory stop, Defendant Mintz readily confirmed Kramer's identity and vehicle information. There were no warrants or other adverse information. Mintz also learned Kramer lived nearby and, significantly, that he was obviously unarmed. Throughout

5

this encounter, Kramer thus did not pose any threat of imminent deadly harm or any threat of imminent serious bodily injury to anyone.

18.   After roughly 18 minutes from the beginning of his stop, Defendant Mintz decided to arrest Kent Kramer for DUIL. Defendant Mintz believed Kramer had failed the sobriety tests he gave him, being physically or otherwise unable to carry them out, losing his balance from time to time, according to Mintz. Mintz also observed, he says, that Kramer walked with a limp. In short, Kramer's ability to ambulate was substantially impaired according to Mintz. Defendant Mintz, on the other hand, was not physically impaired in any way. Mintz wore winter boots, which were very well-suited to the night's wintry conditions, while Kramer had gym shoes on, which were unsuited to those conditions.

19.   Earlier that evening, Defendant Mintz made an arrest for DUIL of an individual named Thomas John Short. Short later said that Mintz had a "little man" complex, referring to Mintz's short stature and demeanor, behavioral issues suggested by other civilians, as noted above. Mintz was about 5' 3'' tall and weighed approximately 150 pounds. Kent Kramer, in contrast, was 6' 4" tall and weighed approximately 250 pounds.

20.    After deciding to arrest Kent Kramer without any help, Defendant Mintz told him to turn around for handcuffing, which he did. But Kramer hesitated and, according to Mintz asked "if there was anything else that could be done about this*."* Kramer was a negotiator, a salesman by experience and training, and he was familiar with members of the Sandusky department, having spoken with officer Brett Lester, (now Chief Lester) when Lester had stopped him on one occasion in the parking lot of the bank. Kramer got Lester's card and the two left on amicable terms when Lester realized he was looking for someone else.

21. The two men stood between their vehicles, a few feet apart. As Kramer continued to talk to Mintz, offering only nominal resistance, Mintz called dispatch for back-up. Defendant Mintz knew, according to the audio dispatch records, that unit 321 (deputies Laming and Heilig) was a few minutes away, just east and north of the city on non-emergency patrol involving a paper service at a residence on East Custer.

22. But Defendant Mintz did not wait for other officers. Rather, in a misguided step of unilateral authority, he decided to taser Kramer instead, which unduly escalated the encounter. Mintz did not try to maintain the calm of the situation, which had existed between the two men until then (roughly 18 minutes). Nor did he attempt any other physical or persuasive measures to maintain the status quo or that would effect a more peaceful outcome. Defendant Mintz aimed the laser sight of his X 26 taser and shot its two probes into Kramer. The taser was somehow ineffective and its undue use accomplished nothing other than needlessly inflaming the situation.

23. Kramer became agitated and loud. Although agitated, Kramer was not armed and did not pose any objective threat of serious bodily harm to Defendant Mintz or to anyone else under the circumstances, particularly given Kramer's described unsteadiness and difficulty in walking, as Mintz asserts.

24. Defendant Mintz was easily able to move away from Kramer, eventually going north on Dawson to a point near the east-side entrance to the bank's parking lot, which is on the west side of Dawson (and south of where West Lorraine meets Dawson). Before doing so, Mintz says he used his pepper spray twice on Kramer, when Kramer "walked" towards him. But the lab analysis on Kramer's clothing, conducted by the Michigan State Police, showed no evidence of pepper spray. Mintz got roughly 180 feet from where he had used the taser on Kramer and was

able to separate himself from Kramer by at least 30-40 feet. He was able to do so because he could move with agility and dexterity while Kramer could not.

25. Inexplicably, after separating himself from Kramer, thereby maintaining a suitable zone of safety for himself, Mintz elected to stop and face Kramer, who moved towards him. However, although the back-up officers (deputies Heilig and Laming) were close by and on their way to give him help, and although Kramer got no closer than approximately 27- 30 feet to him (according to measurements of the Michigan State Police Crime Lab), Defendant Mintz continued to show panic, took out his gun, and fired 10 bullets at the unarmed Kramer, striking him 4 or 5 times. One shot penetrated Kramer's chest and heart, fatally wounding him.

26. From an objective standpoint, Kent Kramer did not pose a threat to Defendant Mintz of imminent serious bodily injury and certainly did not pose any deadly danger to him since Kramer was unarmed throughout the encounter. In addition, given the proximity of nearby residences and a motel on the southwest corner of Dawson and M 46 (the very direction of Mintz's fire), the use of deadly force by Mintz was improvident and unreasonable, another significant factor weighing against the use of deadly force and another measure of Mintz's panicked response, poor training and overall unsuitability for police work.

27. In addition, it appears Kramer was fatally wounded when Mintz chose to fire a second sequence of rounds after wounding Kramer in the lower torso or arm. The evidence suggests Mintz's 10 rounds were fired in separate bursts, 5 in an initial burst, which wounded Kramer, and then another 5, with one of the latter rounds killing him.

28. Kramer fell to the ground, fatally wounded, near the driveway to the Chase Bank where he worked. He died on the ground, where he fell, and was pronounced dead by EMS just minutes later.

29. Kent Kramer was 29 years old when Defendant Mintz wrongfully killed him. His family was informed of his tragic and premature death over the telephone later that morning; they were stunned by the terrible news. Their disbelief and grief continues.

30. Funeral services were held on March 4, 2010 at the Kingston United Methodist Church, where Kent had been a member with his parents. He is survived by his mother Paula Kramer, his father Douglas Kramer, his sister Dr. Melanie Kramer-Harrington, his brother-in-law William Harrington, his two nephews, other cousins and kin, and innumerable friends and colleagues. They dearly miss his friendship, warmth and love and those bonds were taken from him when he was unjustly killed. The words of Douglas Kramer, written for his son's eulogy but which in his grief he himself was not able to speak at his son's funeral, provide a measure of Kent's life and loss:

> "In the days to come as we reflect and remember Kent let us each do our very best to use the many happy memories we have of Kent to ease our pain and heartbreak. I ask God to help each of us to not let bitterness or hatred of how Kent was taken from us destroy the goodness in our hearts. Granting forgiveness and understanding to this tragic loss will take every ounce of faith we have but please let that be our goal. Words cannot express the overwhelming support our family has received in this tragic loss. Each person that waited in line to express their support to our family is so greatly appreciated. The loss of our son is still too hard for us to even believe, but as the days pass we will use your many words of support to help us cope with the enduring grief."

**Federal Constitutional Claims: Counts I - III**

(42 § USC 1983)

**Count I – Unlawful Use of a Taser**

31. Plaintiff incorporates by reference paragraphs 1 through 30 as if fully stated herein.

32. Defendant Scott Mintz's actions, his precipitous deployment of an X 26 taser in "probe" mode during a routine traffic stop of a local resident and businessman, violated Kent Kramer's right to be free of excessive force,[1] a protected right under the Fourth Amendment. Not only did this action unduly escalate the encounter, bypassing <u>all</u> other intermediate tactics available to Mintz, including basic physical control measures or the use of his pepper spray (the latter a form of chemical restraint that is harsh but less severe than taser usage in probe mode), it was a very significant amount of force with effects that, themselves, likely played a part in producing the fatal outcome as it is well-documented that people who are tasered suffer disorientation and confusion, conditions that impair good decision-making and, understandably, thereby adversely change a person's behavior.

33. Mintz's use of a taser against Kramer was unwarranted given the circumstances. Although Kramer exhibited verbal opposition to Mintz, he posed no real threat. Escalation of the encounter to such force was excessive and, unfortunately, had the consequence of inflaming the situation, both in terms of Kramer's reaction to such force and Mintz's even more panicked response when the taser did not physically incapacitate Kramer, although the device (according

---

[1] <u>Bryan v McPherson</u>, 590 F3d 767, 774 (9th Cir. 2009): "Beyond the experience of pain, tasers result in 'immobilization, disorientation, loss of balance, and weakness,' even after the electrical current has ended. … [A]fter being tased, a suspect may be dazed, disoriented, and experience vertigo."

10

to later analysis by Taser International) managed to deliver two separate electrical discharges into Kramer, blows characterized as "painful and frightening." <u>Orem v Rephann</u>, 523 F3d 442, 448 (4th Cir. 2008).

34. Although Mintz's narrative statement, produced by him almost two days later (after receiving advice about his situation), self-servingly outlined the night's events with exculpatory descriptions and assertions about its escalation to deadly force, evidence from one witness (Diane Muxlow), who apparently witnessed the encounter up to the tasering,[2] plus the report of deputy Laming,[3] based on his conversation with Mintz at the scene of the killing, demonstrate the believable facts are markedly different than those offered by Mintz.[4]

## Count II – Unlawful Use of Deadly Force

(42 § USC 1983)

35. Plaintiff incorporates by reference paragraphs 1 through 34 as if fully stated herein.

36. Defendant Mintz's use of deadly force was objectively unreasonable since Kramer was unarmed and/or as otherwise outlined above, especially as Defendant Mintz had reasonable, non-deadly, means to apprehend Kramer and resolve the encounter without using any deadly force.

---

[2] Her statements are in the investigative file, including a videotape of her interview by MSP detective Brian Ferguson. Those are incorporated by reference.
[3] His statement is part of the investigatory file and is also incorporated by reference.
[4] Mintz refused all requests for questioning by investigators, choosing to assert his right against self-incrimination. His claim that Kramer ran to within 10-12 feet of him when he shot him, is pointedly belied by the physical evidence, based on measurements of the crime scene by the Michigan State Police Crime Lab. Those measurements are incorporated by reference, as is the evidence of his refusal to be interviewed, which is also part of the investigative file. There is no video of the events since his recorder did not hold any data from it, although it did so of an arrest he made just a few hours before.

37. The Fourth Amendment does not consider an officer's desire to put a sudden end to an encounter as a permissible reason to escalate the level of force.[5] Defendant Mintz's use of his taser and his ultimate use of deadly force were the products of his lack of self-control, poor training and generally unfit performance; they were not objectively warranted by circumstances.

## Count III – Municipal Liability

(42 § USC 1983)

38. Plaintiff incorporates by reference paragraphs 1 through 37 as if fully stated herein.

39. As for the Defendant City of Sandusky, there is liability for officer misconduct as here under Canton v Harris, 489 US 378 (1989) inasmuch as it had a responsibility to employ suitable persons for police work and supervise and train them in the appropriate handling of incidents such as the one involving Kent Kramer.

40. A program of effective training/supervision would suitably instruct officers about encounters with subjects who may be verbally or otherwise uncooperative but who are unarmed, instructing officers of the need to maintain or defuse such a situation in order to bring it to a peaceable conclusion by the use of tactics for the apprehension of such persons through reasonable, non-deadly, alternatives. A program of effective training/supervision would assure the fitness of officers to carry out such responsibilities in a manner that is both safe for the public and for the officers.

41. The need for such training/supervision was, and is, obvious being part of the ordinary circumstances/challenges of police work, particularly as demonstrated by the

---

[5] "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." Bryan v McPherson, *supra* at 775.

panicked/unstable response of the inexperienced and ill-suited Scott Mintz. Although Mintz had nominal training in some defensive tactics[6] and thus was aware of them, he utterly failed to function in any semblance of conformance with them.

42. The failure of the City of Sandusky to have such training/supervision makes it responsible for the constitutional injuries suffered by Kent Kramer, which were inflicted on him by Scott Mintz. The Defendant City of Sandusky was deliberately indifferent to whether its officers, particularly its part-time officers, could actually carry out the ordinary duties of their jobs and manage the circumstances of police work safely for themselves and for civilians.

## State Law Claims: Counts IV - V

### Count IV – Assault & Battery

(MCL 691.1407(3))

43. Plaintiff incorporates by reference paragraphs 1 through 42 as if fully stated herein.

44. Defendant Mintz willfully shot and killed Plaintiff's decedent and his actions constituted an assault and battery under Michigan law.

45. In so doing, Defendant Mintz acted maliciously or with a wanton or reckless disregard of the rights of Plaintiff's decedent.

---

[6] It appears in 2007 Mintz had a rudimentary course at Lake Superior State College, as a condition for consideration for employment as a police officer, in such tactics, the goal of which is to make a future police officer aware of the force continuum, while giving him/her an idea of the physical tactics to use.
This course used the PPCT training format, which stands for pressure point control tactics, techniques that complement the legal standard of reasonable force. Although he received ongoing training in shooting, there is no evidence that he received ongoing training to give him the actual practical skills he needed to meet the standard of the force continuum. His performance belies any such proficiency.

46. Defendant Mintz's conduct was unlawful under the circumstances and he is culpable for the loss of life, and other damages, suffered by Plaintiff's decedent. <u>Grawey v Drury</u>, 567 F3d 302, 316 (6th Cir. 2009).

## Count V – Michigan Wrongful Death Act Claim

(MCL 600.2922)

47. Plaintiff incorporates by reference paragraphs 1 through 46 as if fully stated herein.

48. Kent Kramer suffered a wrongful death under Michigan law. His death at the hands of Scott Mintz may be remedied to a lesser or different extent as provided by MCL 600.2922 and its settlement provisions.

49. Plaintiff asks for recovery under the provisions of that statute for the benefit of any interested person or to the estate itself as the circumstances warrant. These include damages for conscious pain and suffering, loss or expenses of the estate and economic damages as may be recoverable.

## Conclusion and Prayer

WHEREFORE, Plaintiff prays this Court grant the following relief:

(A) That upon a trial on the merits, it enter judgment in Plaintiff's favor against the Defendants in an amount that affords full and fair compensation for all damages suffered by Plaintiff's decedent or by the estate, including all economic and non-economic measures, as a matter of federal law.

(B) That upon a trial on the merits, it award punitive damages to Plaintiff against the individual Defendant, Scott Mintz, as the circumstances warrant.

(C) That it conduct a jury trial to assess liability and damages.

(D) That it award Plaintiff damages and costs, including reasonable attorney fees, pursuant to 42 USC § 1988 and grant any other relief to which Plaintiff may be entitled.

(E) That it award Plaintiff or other claimants damages pursuant to the Michigan Wrongful Death Act as may be appropriate under the circumstances and as may be warranted by the proofs, including exemplary damage.

Respectfully Submitted,

Constitutional Litigation Associates, P.C.

By: _/s/  Hugh M. Davis_____
Hugh M. Davis, P12555
Co-Counsel for Plaintiff
450 W. Fort Street, Suite 200
Detroit, MI  48226
313.961-2255/Fax: 313.961-5999
conlitpc@sbcglobal.net

Dated:   February 20, 2012

## PLAINTIFF'S JURY DEMAND

Plaintiff Estate of Kent Kramer hereby demands a trial by jury in the above-captioned matter.

Respectfully Submitted,

Constitutional Litigation Associates, P.C.

By: _/s/  Hugh M. Davis_____
Hugh M. Davis, P12555
Co-Counsel for Plaintiff
450 W. Fort Street, Suite 200
Detroit, MI  48226
313.961-2255/Fax: 313.961-5999
conlitpc@sbcglobal.net

Dated:   February 20, 2012
*F:\Cases\Kramer, Kent\Pldgs\Complaint(Final 2-20-12).doc*